UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IAN FINE, JOSHUA ROWE, and PAUL MAGYAR,<br><br>                                 Plaintiffs,<br><br>-against-<br><br>ADVENTURES, INC., STEPHEN STERNSCHEIN, and JOHN DOE 1-10, AND ABC CORPORATION 1-10.<br><br>                                 Defendants. | Case No.:<br><br>**COMPLAINT AND JURY DEMAND** |

**NATURE OF THE ACTION**

1. This action arises from Defendants' willful failure to pay earned wages, bonuses, and other compensation to Plaintiffs—three senior executives—despite repeated assurances and contractual obligations. Over a sustained period, Defendants knowingly withheld salary payments, ignored written compensation agreements, and misrepresented the company's financial condition, forcing Plaintiffs to continue working under false pretenses and ultimately resign due to nonpayment.

2. Defendants' misconduct was not isolated or accidental, but part of a broader scheme of financial mismanagement and self-dealing orchestrated by Defendant Stephen Sternschein, the CEO of AdVentures, Inc. Sternschein exerted complete control over company finances, commingled corporate funds with personal and unrelated ventures, and diverted company assets for personal use—all while deceiving Plaintiffs, clients, and stakeholders to conceal the company's insolvency.

1

3. As a result of Defendants' actions, Plaintiffs suffered substantial economic harm, including the loss of more than $275,000 in unpaid wages and bonuses. In addition, each Plaintiff experienced reputational harm due to Defendants' false and defamatory statements, which were published to third parties, industry partners, and clients, compounding the damage to their long-standing professional relationships and future earning potential.

4. Plaintiffs assert claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the New York Labor Law ("NYLL"), including but not limited to NYLL §§ 190, 191, 193, 195, and 198. Plaintiffs also bring related common law claims for breach of contract, unjust enrichment, and defamation. Plaintiffs seek unpaid compensation, statutory penalties, liquidated damages, reputational damages, costs, attorneys' fees, and all other relief available under law and equity.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under the Fair Labor Standard Act ("FLSA").

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), in that the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

7. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

8. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District.

9. Defendants conducted business in the State of New York and within this District at all relevant times.

## PARTIES

10. Plaintiff Ian Fine ("Fine") is an individual and resident of Kings County, New York, who worked for AdVentures, Inc. in an executive role based in New York.

11. Plaintiff Joshua Rowe ("Rowe") is an individual and resident of Kings County, New York, who worked for AdVentures, Inc. in an executive role based in New York.

12. Plaintiff Paul Magyar ("Magyar") is an individual and resident of Kings County, New York, who worked for AdVentures, Inc. in an executive role based in New York.

13. Defendant AdVentures, Inc. ("AdVentures") is a corporation organized under the laws of the State of Delaware with a principal place of business located at 501 Brushy Street, Austin, Texas 78702, and employed Plaintiffs.

14. AdVentures is and was in the business of selling sponsorship opportunities on behalf of independent music venues and festivals across the United States, from New York to California to Hawaii.

15. AdVentures conducted business in approximately twenty-five (25) states.

16. Upon information and belief, AdVentures was and is a business engaged in interstate commerce that had gross sales in excess of five hundred thousand dollars ($500,000.00) per year during the relevant time period.

17. AdVentures occasionally issued paystubs to Plaintiffs through the Justworks Employment Group LLC that indicated "PEO for Adventures Agency Inc 809 E 6th St, Austin, TX 78702, (210) 215-2770."

18. Defendant Stephen Sternschein ("Sternschein") is the CEO of AdVentures, Inc., with operational control over its employees and payroll practices. He resides in Travis

3

County, Texas and is sued in his individual capacity as an employer under the FLSA and NYLL.

19. At all relevant times, Sternschein exercised operational and financial control over Plaintiffs' employment, making him personally liable as Plaintiffs' employer.

20. At all times relevant, Sternschein dominated and abused the corporate form to avoid lawful obligations that including paying Plaintiffs for their work.

21. Upon information and belief, Sternschein owns or otherwise controls the entities known as: Texas Music Holding Company ("TMHC"), Heard Entertainment, Heard Presents, Velvet Technology, Parish Music Venue, and Empire Control Room and Garage.

22. Sternschein is the founder and managing partner of Heard Presents, which is the parent company of AdVentures.

23. At all times relevant to this action, Sternschein had the power to hire and fire employees, set employees' wages, retain time and payroll records, and otherwise control the terms and conditions of all employees, including Plaintiffs.

24. Defendant John Does 1 through 10 are fictitiously named defendants, the identities of which are unknown at present, but who are liable to Plaintiffs by reason of their knowing and joint participation in the conduct that damaged Plaintiffs, and who aided and abetted, ratified, authorized, acquiesced in, approved or condoned the misconduct complained of in this complaint, and specifically, includes all the individuals who participated in the illegal conduct referred to herein and/or who engaged in intentional and/or reckless, extreme or outrageous conduct, which caused Plaintiffs harm.

25. Defendants ABC Corps 1 through 10 are fictitious entities, the identities of which are unknown at present, but that are liable to Plaintiffs by reason of their knowing and joint participation in the conduct that damaged Plaintiffs, pursuant to the doctrine of respondeat superior, or that are otherwise responsible to Plaintiffs for the wrongful conduct referred to herein.

26. At all relevant times to this action, AdVentures, Sternschein, John Does 1 through 10, and ABC Corps 1 through 10 (collectively hereinafter referred to as "Defendants") were each engaged in business affecting commerce within the meaning of the FLSA and the NYLL.

27. At all relevant times to this action, Defendants were, and continue to be, single and joint employers and have had a high degree of interrelated and unified operations, and share common management, comingled funds, common ownership, common control, common business purposes, and interrelated business goals.

28. At all relevant times to this action, Defendants were Plaintiffs' employers within the meaning of the FLSA and the NYLL, because they exercised sufficient control of AdVentures' day-to-day operations to be considered Plaintiffs' employers.

## FACTUAL ALLEGATIONS

29. Upon information and belief AdVentures generated over Six Million Dollars ($6,000,000.00) in revenue during the relevant time period with a margin of approximately 30%.

30. Upon information and belief, Defendant Sternschein engaged in a pervasive pattern of financial mismanagement, self-dealing, and deception that directly harmed Plaintiffs and other employees, vendors, and clients of AdVentures.

31. As CEO, Sternschein was tasked with raising capital for AdVentures. Despite this responsibility, he failed to prepare a viable funding deck for over a year. Sternschein expanded this role to include raising capital for unrelated TMHC entities and side projects. Upon information and belief, this was done without proper disclosure or corporate approval.

32. Sternschein's behavior during meetings was often erratic and inappropriate. He made crude, misogynistic remarks, and created a hostile work environment. Staff began referring to being inconvenienced or harmed by his erratic behavior as getting "Sternscheined."

33. Sternschein occasionally conducted employee meetings in his home.

34. Sternschein was directly observed using cocaine at company-related gatherings and regularly attended meetings visibly hungover and disheveled. On several occasions, Sternschein was too impaired to work due to excessive partying.

35. Upon information and belief, Sternschein was the only individual with access to AdVentures' financial records and the sole authority to distribute payments.

36. Sternschein diverted company attention and resources toward pet projects and ventures lacking legitimate business justification, including a run-down resort in Belize, a recording studio in Austin, and companies owned by personal acquaintances.

37. Sternschein commingled corporate funds with his own, and with funds belonging to other entities that he owned or otherwise controlled.

38. Upon information and belief, Sternschein used corporate funds for personal expenditures such as vapes, alcohol, streaming subscriptions, and vacations.

39. During key industry events such as South by Southwest ("SXSW"), Sternschein was mostly absent or used the company's presence to entertain romantic interests, disregarding business responsibilities and wasting company resources.

40. Sternschein routinely represented to Plaintiffs that specific funding or loans were imminent or had been received—including an alleged $2M loan from the City of Austin—which upon information and belief, were fabricated or misrepresented. On one occasion, Sternschein claimed AdVentures received approximately $230,000.00 in funding, which was later revealed to be from the City of Austin, Texas and subject to restricted use.

41. In or around May 2024, multiple team members repeatedly requested a full accounting of company finances. Sternschein promised a walk-through of the books, which never occurred. He claimed that an accountant named "Tod" was hired to rectify the records, but Plaintiffs never received communications from this individual. Upon information and belief, "Tod" may not exist and was used as a pretext to delay disclosure of financial mismanagement.

42. When questioned about financial instability and failure to pay staff or vendors, Sternchein responded with hostility and profanity.

<u>Plaintiff Fine</u>

43. Fine was employed by Defendants, as Vice President of Partnerships & Strategic Services, from on or about July 27, 2022 until on or about January 24, 2025.

44. At all relevant times, Fine worked remotely from the State of New York and the State of New Jersey.

7

45. Fine, a veteran sales and sponsorship executive with over 10 years of experience, joined AdVentures as Vice President of Strategic Services on July 27, 2022. Fine's entire career has been built on long-term trust, professional integrity, and sustained client relationships—an asset irreparably damaged by Defendant Stephen Sternschein's conduct.

46. Defendants agreed to pay Fine an annual salary of $175,000.00 in addition to bonuses, stock options, and other benefits including health insurance.

47. Defendants deferred fifty percent (50%) of Fine's salary from August 5, 2022 through March 17, 2023.

48. Defendants ultimately withheld $44,214.15 in deferred wages due to Fine.

49. Defendants failed to pay regular wages to Fine that he earned from July 19 through September 27, 2024, and from December 27, 2024 through January 25, 2025. The total amount withheld by Defendants for these periods is $127,884.63.

50. Subsequently, Sternschein made partial payments of these earned wages to Fine totaling $62,119.60, but still owe Fine $72,746.35 in unpaid wages.

51. Sternschein paid Fine from his personal funds.

52. Sternschein paid Fine with funds obtained from Sternschein's partner, David Machinist.

53. Sternschein paid Fine from a separate entity identified as Heard Presents, which is the parent company of AdVentures.

54. Defendants also withheld Fine's earned and non-discretionary bonuses for 2023 and 2024, which were based on target earnings and set forth in a letter agreement

dated July 19, 2022. The unpaid bonuses total $34,412.38 for 2023 and $25,587.62 for 2024.

55. On August 19, 2024, Fine was forced to resign due to Defendants' continued failure to pay earned wages and bonuses of approximately $132,746.35. His resignation letter made clear that he would not waive his right to payment. Sternschein never responded or followed up. Fine was physically present in New York City at the time of his resignation.

56. Fine was further harmed by Sternschein's false statements to third parties. In conversations with industry peers, including Andy Sternovitz, Sternschein falsely accused Fine of stealing from the company—despite Fine never having access to financial records or AR systems. These defamatory statements exacerbated Fine's reputational damage.

57. Fine personally witnessed and experienced professional and reputational damage stemming from Sternschein's erratic conduct. In one instance, Sternschein sent a threatening email to Genesco/Jägermeister—a client Fine had worked with for over five years—when they were only two days late on payment, despite AdVentures having failed to complete the onboarding of venues promised under the deal.

58. Sternschein's reckless email, sent without Fine's knowledge, nearly destroyed the client relationship and forced Fine to do significant damage control. Genesco ultimately renewed the deal solely due to Fine's personal credibility, but the relationship was later ruined when Sternschein failed to pay the contracted venues.

59. Fine also managed AdVentures' relationship with Monster Energy ("Monster"), which was the company's most significant partner during his tenure. Due to

AdVentures' nonpayment to venues, Monster received numerous complaints from participating locations.

60. Sternschein falsely claimed that unpaid venues had submitted invoices incorrectly. The program's collapse led to the termination of Monster's primary point of contact and permanently severed Fine's relationship with the brand, despite a decade of successful collaboration.

Plaintiff Rowe

61. Rowe was employed by Defendants, as Chief Creative Officer, from on or about October 1, 2022 until on or about August 2, 2024.

62. At all times relevant, Rowe worked remotely from New York City.

63. Rowe worked closely with key clients and vendors of AdVentures and was a primary point of contact and representative of the company in public-facing negotiations. As a result, Defendants' failure to pay vendors and employees, combined with Sternschein's false statements, caused direct and irreparable damage to Plaintiff Rowe's professional reputation.

64. When Rowe raised concerns regarding unpaid wages and vendor debts, Sternschein falsely assured him that he had "taken care" of major outstanding obligations, including payments owed to ASA Fabrication—a vendor introduced by Rowe. In fact, no such resolution occurred, and ASA later indicated it would never have accepted the project had it known Sternschein was involved, citing past incidents of nonpayment.

65. Defendants agreed to pay Rowe an annual salary of $200,000.00 in addition to bonuses, stock options, and other benefits including health insurance.

66. Defendants deferred twenty-five percent (25%) of Rowe's salary from October 1, 2022 through March 26, 2023.

67. Defendants ultimately withheld $18,461.62 in deferred wages due to Rowe.

68. Defendants failed to pay regular wages to Rowe that he earned from June 30 through August 2, 2024. The total amount withheld by Defendants for this period is approximately $20,428.58.

69. Defendants also withheld Rowe's earned and non-discretionary bonuses for 2023 and 2024, which were based on target earnings and set forth in an employment agreement dated August 15, 2022. The unpaid bonuses total $32,248.78 for 2023 and $31,310.66 for 2024.

70. Rowe was forced to resign because Defendants withheld his earned wages. In total, Defendants owe Rowe approximately $102,485.64 in unlawfully withheld earned compensation. Defendants terminated Rowe's health insurance immediately. Rowe was physically present at the time of his resignation.

71. Following his resignation in July 2024, Rowe was defamed by Sternschein in a company-wide and partner-wide email dated March 31, 2025, which falsely stated that AdVentures conducted an audit and discovered "financial irregularities" resulting in the dismissal of the "majority of AV's small team." This statement is demonstrably false as to Plaintiff Rowe, who resigned months earlier.

Plaintiff Magyar

72. Magyar was employed by Defendants, as Vice President of Strategic Services, from on or about May 1, 2023 until on or about August 19, 2024.

73. At all relevant times, Magyar worked remotely from New York City.

74. Shortly after Magyar began employment, AdVentures finalized a transformative partnership with Monster Energy's "Tour Water" program—a deal originated and nurtured by Magyar. The program scaled rapidly from 2 to 70 venues and represented a high-margin opportunity.

75. Monster's initial $500,000.00 payment was made in early April 2024 with the understanding that AdVentures would use the funds to pay participating venues promptly. However, none of the promised venue payments were made—except to venues Sternschein personally owned.

76. Sternschein blamed the unpaid venues on invoicing problems rather than admitting to his own misconduct. When Magyar and others pushed back, Sternschein refused to attend scheduled meetings with Monster and claimed—without corroboration—that he had handled venue concerns personally.

77. The Monster partnership unraveled, with participating venues demanding payment and reaching out to Monster directly. Sternschein continued to stall and deflect, ultimately destroying the partnership. Magyar's reputation with Monster and its decision-maker, Jon Bratta, was permanently tarnished. Bratta was later let go, and Magyar's longstanding relationship with Monster—and prospective future opportunities—were irrevocably damaged.

78. Magyar was also the principal contact and deal-closer for AdVentures' retainer clients, including LEVITATION, Rising Sun Presents, and Northlands. AdVentures functioned as the "paymaster" for these clients, collecting payments on their behalf but failing to disburse funds as required under contract.

12

79. In April 2024, Magyar sold over $100,000.00 in sponsorships for LEVITATION's Austin Psych Fest. After May 7, 2024, LEVITATION repeatedly complained to Magyar that no payments had been made. Sternschein deflected blame, falsely promised imminent investment, and proposed deducting future retainer fees from the balance owed—none of which came to pass.

80. Ultimately, LEVITATION terminated its relationship with AdVentures, with over $70,000.00 in unpaid sponsorship revenue still outstanding.

81. On August 8, 2024, Sternschein called Magyar for the first time to discuss Magyar's unpaid wages and proposed an equity-for-salary arrangement. The call was disorganized and nonsensical. Magyar later followed up by email requesting clear terms and a payroll schedule, which Sternschein never provided.

82. On or about August 14, 2024, Sternschein admitted to Magyar that he could not pay Magyar's earned compensation.

83. Magyar was forced to resign because Defendants withheld his earned wages. In total, Defendants owe Magyar approximately $59,448.60 in unlawfully withheld earned compensation.

84. Defendants agreed to pay Magyar an annual salary of $140,000.00 in addition to bonuses and other benefits.

85. Defendants withheld fifty percent (50%) of Magyar's first paycheck issued on May 12, 2023. The total amount unlawfully withheld, and never paid to Magyar, was $2,692.31.

86. Defendants failed to pay regular wages to Magyar that he earned from July 14 through August 19, 2024. The total amount withheld by Defendants for this period is approximately $10,769.24.

87. Defendants also withheld Magyar's earned and non-discretionary bonuses for 2023 and 2024, which were based on target earnings and set forth in an employment agreement dated April 13, 2023. The unpaid bonuses total $6,726.96 for 2023 and $39,260.09 for 2024.

## COUNT I
## VIOLATION OF THE FLSA (29 U.S.C. §206)

88. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

89. At all relevant times, Defendants were employers engaged in commerce and/or in the production of goods for commerce within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.

90. At all relevant times, Plaintiffs were employees entitled to the protections of the FLSA.

91. Pursuant to 29 U.S.C. § 206, the FLSA requires covered employers to pay non-exempt employees at least the federal minimum wage for all hours worked.

92. Defendants willfully failed to pay Plaintiffs all earned wages for work performed, including regular wages and non-discretionary bonuses, in violation of the FLSA.

93. As a result of Defendants' unlawful conduct, Plaintiffs are entitled to recover their unpaid wages, liquidated damages, attorneys' fees, and costs pursuant to 29 U.S.C. § 216(b) in amounts to be determined at trial.

## COUNT II
## VIOLATION OF THE NYLL (§§190, 191, 193, 198)

94. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

95. Defendants employed Plaintiffs within the meaning of the New York Labor Law ("NYLL") §§ 190 and 191.

96. Defendants failed to pay Plaintiffs their earned wages on a timely and regular basis as required by NYLL § 191.

97. Defendants also made unlawful deductions from Plaintiffs' wages and withheld compensation in violation of NYLL § 193.

98. Defendants' violations of the NYLL were willful and not in good faith.

99. As a result, Plaintiffs are entitled to recover their unpaid wages, statutory liquidated damages, attorneys' fees, and costs pursuant to NYLL § 198 in amounts to be determined at trial.

## COUNT III
## VIOLATION OF THE NYLL (§§195(3) & 198)

100. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

101. NYLL § 195(3) requires employers to furnish employees with accurate wage statements each payday that include, among other things, hours worked, rates of pay, and gross and net wages.

102. Defendants failed to provide Plaintiffs with compliant wage statements.

103. As a result of Defendants' failure to comply with NYLL § 195(3), Plaintiffs are each entitled to statutory damages, attorneys' fees, and costs pursuant to NYLL § 198(1-d) in amounts to be determined at trial.

## COUNT IV
## BREACH OF CONTRACT

104. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

105. Plaintiffs entered into valid and enforceable employment agreements with Defendants, which set forth their compensation, including salary and performance-based bonuses.

106. Plaintiffs fully performed their duties under the agreements.

107. Defendants breached the agreements by failing to pay Plaintiffs their agreed-upon salary and bonuses.

108. As a direct and proximate result of Defendants' breaches, Plaintiffs suffered damages in amounts to be determined at trial.

## COUNT V
## UNJUST ENRICHMENT

109. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

110. Defendants knowingly accepted and retained the benefit of Plaintiffs' services without providing the compensation owed.

111. It would be unjust and inequitable for Defendants to retain the benefit of Plaintiffs' services without paying for them.

16

112. Plaintiffs are entitled to recover the value of the services they conferred on Defendants in an amount to be determined at trial.

## COUNT VI
## DEFAMATION

113. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

114. Defendant Sternschein published false and defamatory statements about Plaintiffs to third parties, including clients, vendors, and industry peers.

115. These statements included baseless allegations of financial misconduct, theft, and irregularities that were knowingly false or made with reckless disregard for the truth.

116. The defamatory statements harmed Plaintiffs' reputations and caused loss of business relationships and professional opportunities.

117. As a direct and proximate result of the defamatory statements, Plaintiffs suffered damages, including reputational harm, emotional distress, and financial losses in amounts to be determined at trial.

118. Plaintiffs seek compensatory and punitive damages in amounts to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request the following relief:

    A.    Unpaid compensation;

    B.    Pre-judgment and post-judgment interest;

    C.    Liquidated damages;

    D.    Maximum statutory penalties allowed under the NYLL;

  E. Emotional distress damages;

  F. Punitive damages;

  G. Reasonable attorneys' fees and costs of the action; and

  H. Such other and further relief, in law or equity, and this Court may deem appropriate and just.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they have a right to a jury trial.

Dated: New York, New York
   July 10, 2025

              **THE LAW OFFICES OF**
              **THOMAS H. ANDRYKOVITZ, P.C.**

              /s/ Thomas H. Andrykovitz
              Thomas H. Andrykovitz, Esq.
              260 Madison Avenue, 15th Fl.
              New York, New York 10016
              thomas@thomashenrylaw.com
              *Attorneys for Plaintiffs*